**JODI THORP**
California Bar No. 223663
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California  92101
Telephone:  (619) 234-8467 ext. 3705

Attorneys for Ms. Soto

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE LARRY A. BURNS)**

| | |
|---|---|
| UNITED STATES OF AMERICA, | U.S.D.C. No. 07CR3104-LAB |
| Plaintiff, | Date: |
| | December 17, 2007 |
| v. | Time: |
| | 2:00 p.m. |
| ROSA MARIA SOTO-ORTIZ, | **STATEMENT OF FACTS AND** |
| Defendant. | **MEMORANDUM OF POINTS AND** |
| | **AUTHORITIES IN SUPPORT OF MOTIONS** |

**I.**

**STATEMENT OF FACTS**[1]

   Ms. Soto, along with her co-defendants are charged in an indictment issued by the January

2007 Grand Jury with three counts of transporting illegal aliens in violation of 8 U.S.C. § 1324 (a)(1)(A)(ii)

and three counts of bringing in illegal aliens for financial gain in violation of 8 U.S.C. § 1324 (a)(2)(B)(ii).

The government alleges that Ms. Soto was driving a vehicle that was watching for border patrol while a co-

defendant was transporting illegal aliens.

//

//

---

  [1] This statement of facts is taken from the criminal complaint, indictment, and discovery
provided by the government.  Ms. Soto does not adopt these facts and reserves the right to
challenge these facts at any future proceeding.

**II.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING Ms. Soto OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

**A.    Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury. That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007. See Reporter's Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A. Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[2] These instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A. See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[3]

**1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from

---

[2] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[3] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury. Ms. Soto requests that the video presentation be produced. See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

[4] See also id. at 20 ("You're all about probable cause.").

1  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

2  federal la w or should not be a federal law designating certain activity [as] criminal is not up to you." See id.

3  at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

4  judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

5  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

6  be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

7  because the grand jurors disagree with a proposed prosecution.

8         Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

9  to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

10                    I've gone over this with a couple of people.  You understood from
                      the questions and answers that a couple of people were excused, I
11                    think three in this case, because they could not adhere to the
                      principle that I'm about to tell you.

12

13  Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

14  disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

15  view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

16         Examination of the voir dire transcript, which contains additional instructions and commentary in

17  the form of the give and take between Judge Burns and various prospective grand jurors, reveals Judge Burns's

18  emphasis on the singular duty to determine whether or not probable cause exists, and his statement that grand

19  jurors cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous

20  series of instructions already given to the grand jury venire.  In one of his earliest substantive remarks, Judge

21  Burns makes clear that the grand jury's sole function is probable cause determination.

22                    [T]he grand jury is determining really two factors: "do we have a
                      reasonable belief that a crime was committed?  And second, do we
23                    have a reasonable belief that the person that they propose that we
                      indict committed the crime?"

24
                      If the answer is "yes" to both of those, then the case should move
25                    forward.  If the answer to either of the questions is "no," then the
                      grand jury should not hesitate and not indict.

26

27  See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

28  term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

1  addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

2  committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

3  crime."

4         Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that,

5  in some unknown set of circumstances, they might decline to indict even where there was probable cause.

6  Because of the redactions of the grand jurors' names, Ms. Soto will refer to them by occupation.  One is a

7  retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The

8  CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not

9  an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified immigration

10 cases.  See id.

11        Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

12 CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this

13 district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

14 Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were

15 simply not capable of expression in the context of grand jury service.

16              Now, the question is can you fairly evaluate [drug cases and
              immigration cases]?  Just as the defendant is ultimately entitled to

17            a fair trial and the person that's accused is entitled to a fair appraisal
              of the evidence of the case that's in front of you, so, too, is the

18            United States entitled to a fair judgment.  If there's probable cause,
              then the case should go forward.  *I wouldn't want you to say*, "well,

19            yeah, there's probable cause, but I still don't like what our
              government is doing.  I disagree with these laws, so I'm not going

20            to vote for it to go forward."  If that is your frame of mind, the
              probably you shouldn't serve.  Only you can tell me that.

21

22 See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand

23 juror know that he would not want him or her to decline to indict in an individual case where the grand juror

24 "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See id.

25 Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

26 manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support

27 a charge even if [the CSW] thought the evidence warranted it."  See id.  Again, Judge Burns's question

28 provided no context; he inquired regarding "a case," a term presumably just as applicable to possession of a

1  small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand

2  juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit

3  them to vote "no bill" in the face of a showing probable cause.

4        Just in case there may have been a grand juror that did not understand his or her inability to exercise

5  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA

6  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

7  "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical

8  marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

9  considerations into account.

10          Well, those things -- the consequences of your determination
    shouldn't concern you in the sense that penalties or punishment,
11          things like that -- we tell trial jurors, of course, that they cannot
    consider the punishment or the consequence that Congress has set
12          for these things. We'd ask you to also abide by that. We want you
    to make a business-like decision of whether there was a probable
13          cause. . . .

14  Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went

15  on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

16        In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

17  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

18  juror is obligated to vote to indict if there is probable cause.

19          I can tell you sometimes I don't agree with some of the legal
    decisions that are indicated that I have to make. But my alternative
20          is to vote for someone different, vote for someone that supports the
    policies I support and get the law changed. It's not for me to say,
21          "well, I don't like it. So I'm not going to follow it here."

22          You'd have a similar obligation as a grand juror even though you
    might have to grit your teeth on some cases. Philosophically, if you
23          were a member of congress, you'd vote against, for example,
    criminalizing marijuana. I don't know if that's it, but you'd vote
24          against criminalizing some drugs.

25          That's not what your prerogative is here. You're prerogative instead
    is to act like a judge and say, "all right. This is what I've to deal
26          with objectively. Does it seem to me that a crime was committed?
    Yes. Does it seem to me that this person's involved? It does." *And*
27          *then your obligation, if you find those to be true, would be to vote*
    *in favor of the case going forward.*

28

1  Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both

2  questions are answered in the affirmative, lead to an "obligation" to indict.

3       Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

4  paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

5  to indict in every case in which there was probable cause.

6                      The Court: Do you think you'd be inclined to let people go in drug
   cases even though you were convinced there was probable cause

7                      they committed a drug offense?
   REA: It would depend on the case.

8                      The Court: Is there a chance that you would do that?
   REA: Yes.

9                      The Court: I appreciate your answers. I'll excuse you at this time.

10

11  Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his

12  political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

13  should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

14  indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge Burns

15  made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to

16  hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

17  because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[5]

18  See id. at 27. That is why even the "chance," see id., that a grand juror might not vote to indict was too great

19  a risk to run.

20      **2.**        **The Instructions Posit a Non-Existent Prosecutorial Duty to
   Offer Exculpatory Evidence.**

21

22       In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

23

24       [5] This point is underscored by Judge Burns's explanation to the Grand Jury that a

25  magistrate judge will have determined the existence of probable cause "in most circumstances"
   before it has been presented with any evidence. See Ex. A at 6. This instruction created an

26  imprimatur of finding probable cause in each case because had a magistrate judge not so found,
   the case likely would not have been presented to the Grand Jury for indictment at all. The Grand

27  Jury was informed that it merely was redundant to the magistrate court "in most circumstances."
   See id. This instruction made the grand jury more inclined to indict irrespective of the evidence

28  presented.

grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.[6]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury.  You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire.  After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that cuts against the charge, you'll be informed of that.  They have a duty to do that."  See id.  Thus,

---

[6] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").
    Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys.  See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.
    In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1   Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was

2   "adverse" or "that cuts against the charge." See id.

3   **B.      Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

4

5          The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

6   grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth

7   Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

8   approach[7] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

9   the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand

10  jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January

11  2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a

12  bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to

13  exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United

14  States v. Williams, 504 U.S. 36, 49 (1992).

15         For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

16  II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

17  deciding whether a particular prosecution shall be instituted or followed up, performs much the same function

18  as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510

19  (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

20  I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

21  prosecutorial."). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that

22  the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but

23  also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the

24  prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of

25  the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was

26

27         [7] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as

28  imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1   "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

2   that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., <u>Criminal Procedure</u>

3   § 15.2(g) (2d ed. 1999)).

4          Indeed, the <u>Navarro-Vargas II</u> majority agrees that the grand jury possesses all the attributes set forth

5   in <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986).  <u>See id.</u>

> The grand jury thus determines not only whether probable cause
> exists, but also whether to "charge a greater offense or a lesser
> offense; numerous counts or a single count; and perhaps most
> significant of all, a capital offense or a non-capital offense -- all on
> the basis of the same facts.  And, significantly, the grand jury may
> refuse to return an indictment even "'where a conviction can be
> obtained.'"

10   <u>Id.</u> (quoting <u>Vasquez</u>, 474 U.S. at 263).  The Supreme Court has itself reaffirmed <u>Vasquez</u>'s description of

11   the grand jury's attributes in <u>Campbell v. Louisiana</u>, 523 U.S. 392 (1998), noting that the grand jury "controls

12   not only the initial decision to indict, but also significant questions such as how many counts to charge and

13   whether to charge a greater or lesser offense, including the important decision whether to charge a capital

14   crime."  <u>Id.</u> at 399 (citing <u>Vasquez</u>, 474 U.S. at 263).  Judge Hawkins notes that the <u>Navarro-Vargas II</u>

15   majority accepts the major premise of <u>Vasquez</u>: "the majority agrees that a grand jury has the power to refuse

16   to indict someone even when the prosecutor has established probable cause that this individual has committed

17   a crime."  <u>See id.</u> at 1214 (Hawkins, J. dissenting).  <u>Accord</u> <u>Navarro-Vargas I</u>, 367 F.3d at 899 (Kozinski, J.,

18   dissenting); <u>United States v. Marcucci</u>, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

19   dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

20   But not in Judge Burns's instructions.

21   **C.     Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established
            in Both *Vasquez* and *Navarro-Vargas II*.**

22

23          The <u>Navarro-Vargas II</u> majority found that the instruction in that case "leave[s] room for the grand

24   jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision

25   in <u>Marcucci</u>.  <u>Marcucci</u> reasoned that the instructions do not mandate that grand jurors indict upon every

26   finding of probable cause because the term "should" may mean "what is probable or expected."  299 F.3d at

27   1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge Hawkins ably

28   pointed out.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use

of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). <u>See also</u> <u>id.</u> ("The 'word' should is used to express a duty [or] obligation.") (quoting <u>The Oxford American Diction and Language Guide</u> 1579 (1999) (brackets in original)).

The debate about what the word "should" means is irrelevant here; the instructions here make no such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not choose not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." <u>See</u> Ex. A at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." <u>Vasquez</u>, 474 U.S. at 264.

While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, <u>see</u> Ex. B at 4, 8, n context, it is clear that he could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, he told them that if there is not probable cause, "then the grand jury should hesitate and not indict." <u>See id.</u> at 8. At least in context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1205. Clearly he was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the <u>Navarro-Vargas</u> spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

<u>See</u> Ex. B at 8. Of the two sentences containing the word 'should," the latter of the two essentially states that

1   if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e]

2   room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at

3   1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting

4   the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

5   "responsibilities continue to include both the determination whether there is probable cause and the protection

6   of citizens against unfounded criminal prosecutions.") (citation omitted).

7         By the same token, if Judge Burns said that "the case should move forward" if there is probable

8   cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

9   Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended

10  two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

11  been his intent.  But even if it were, no grand jury could ever have had that understanding.[8]  Jurors are not

12  presumed to be capable of sorting through internally contradictory instructions.  See generally United States

13  v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

14  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

15        Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

16  clear to the grand jurors that "should" was not merely suggestive, but obligatory:

17        (1)      The first occasion occurred in the following exchange when Judge Burns conducted voir

18  dire and excused a potential juror (CSW):

19                    The Court: . . . If there's probable cause, then the case should go
                      forward.  I wouldn't want you to say, "Well, yeah, there's probable
20                    cause.  But I still don't like what the government is doing.  I
                      disagree with these laws, so I'm not going to vote for it to go
21                    forward." If that's your frame of mind, then probably you shouldn't
                      serve.  Only you can tell me that.
22                    Prospective Juror: Well, I think I may fall in that category.
                      The Court: In the latter category?
23                    Prospective Juror: Yes.
                      The Court: Where it would be difficult for you to support a charge
24                    even if                    you thought the evidence warranted it?
                      Prospective Juror: Yes.
25                    The Court: I'm going to excuse you then.

26  ─────────────────

27        [8] This argument does not turn on Ms. Soto's view that the Navarro-Vargas/Marcucci
    reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on
28  the context in which the word is employed by Judge Burns in his unique instructions, context
    which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  See id. ("I wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

        (2)        In an even more explicit example of what "should" meant, Judge Burns makes clear that it there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

Court     . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

> You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and to say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that a crime was committed? Yes.  Does it seem to me that this person's involved? It does."  *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward*.

Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27.  The potential juror responded: "It would depend on the case." Id.  Nevertheless, that juror was excused.  Id. at 28.  Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

        Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

1   scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the

2   prospective jurors, because his message is that there is no discretion not to indict.

3           (3)         As if the preceding examples were not enough, Judge Burns continued to pound the point

4   home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist

5   on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws

6   here."  See id. at 61.

7           (4)         And then again, after swearing in all the grand jurors who had already agreed to indict

8   in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he

9   reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

10  that the evidence is sufficient' . . . . Instead your *obligation* is . . . not to bring your personal definition of what

11  the law ought to be and try to impose that through applying it in a grand jury setting."  See Ex. A at 9.

12          Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

13  penalties to which indicted persons may be subject.

14                      Prospective Juror (REA): ... And as far as being fair, it kind of
                        depends on what the case is about because there is a disparity
15                      between state and federal law.
                        The Court:  In what regard?
16                      Prospective Juror: Specifically, medical marijuana.
                        The Court:  Well, those things -- the consequences of your
17                      determination shouldn't concern you in the sense that penalties or
                        punishment, things like that -- *we tell trial jurors, of course, that*
18                      *they cannot consider the punishment or the consequence that*
                        *Congress has set for these things.  We'd ask you to also abide by*
19                      *that.*  We want you to make a business-like decision of whether
                        there was a probable cause. ...
20

21  See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

22  would obviously leave no role for the consideration of penalty information.

23          The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

24  penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

25  United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

26  reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

27  as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

28  ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized

1    consideration of penalty information.  See 474 U.S. at 263.

2    //

3         Nothing can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

4    again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

5    was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct

6    contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand

7    juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

8    Vasquez:

9              The grand jury does not determine only that probable cause exists
               to believe that a defendant committed a crime, or that it does not.
10             In the hands of the grand jury lies the power to charge a greater
               offense or a lesser offense; numerous counts or a single count; and
11             perhaps most significant of all, a capital offense or a non-capital
               offense – all on the basis of the same facts.  Moreover, "[t]he grand
12             jury is not bound to indict in every case where a conviction can be
               obtained."

13   474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

14   dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

15   initial decision to indict, but also significant decisions such as how many counts to charge and whether to

16   charge a greater or lesser offense, including the important decision whether to charge a capital crime.").  Nor

17   would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See

18   id. at 264.  Judge Burns's grand jury is not Vasquez's grand jury.  The instructions therefore represent

19   structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

20   jury proceeding."  See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must

21   therefore be dismissed.  Id.

22        The Navarro-Vargas II majority's faith in the structure of the grand jury is not a cure for the

23   instructions' excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

24   independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

25   decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may

26   have on a grand jury because "it is the structure of the grand jury process and its function that make it

27   independent."  Id. at 1202 (emphases in the original).

28

Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause determination ... unconstitutionally undermines the very structural protections that the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions because nothing will happen if they disobey them." Id.

In setting forth Judge Hawkins' views, Ms. Soto understands that this Court may not adopt them solely because the reasoning that supports them is so much more persuasive than the majority's sophistry. Rather, she sets them forth to urge the Court *not to extend* what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", especially in light of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states they enjoy. He also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex. A at 8; Ex. B at 17, 28. The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience of the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge

1  Burns has both fashioned his own rules and enforced them.

2  **D.      The Instructions Conflict with <u>Williams</u>' Holding That There Is No Duty to Present**
   **Exculpatory Evidence to the Grand Jury.**

3

4          In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

5  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

6  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

7  common law. <u>See</u> 504 U.S. at 45, 51. <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

8  judicial authority exists." <u>See id.</u> at 47. Indeed, although the supervisory power may provide the authority

9  "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

10 amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

11 Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it

12 does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." <u>Id.</u>

13 at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own

14 initiative, rules of grand jury procedure." <u>Id.</u> at 50. As a consequence, <u>Williams</u> rejected the defendant's

15 claim, both as an exercise of supervisory power and as Fifth Amendment common law. <u>See id.</u> at 51-55.

16         Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

17 present to them evidence that tended to undercut probable cause. <u>See</u> Ex. A at 20.

18              Now, again, this emphasizes the difference between the function of
                the grand jury and the trial jury. You're all about probable cause.
19              If you think that there's evidence out there that might cause you say
                "well, I don't think probable cause exists," then it's incumbent upon
20              you to hear that evidence as well. As I told you, in most instances,
                *the U.S. Attorneys are duty-bound to present evidence that cuts*
21              *against what they may be asking you to do if they're aware of that*
                *evidence.*
22
23 <u>Id.</u> (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their

24 duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

25 [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See</u>

26 <u>id.</u> at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." <u>See</u>

27 <u>Navarro-Vargas</u>, 408 F.3d at 1207.

28         This particular instruction has a devastating effect on the grand jury's protective powers, particularly

if it is not true.  It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not conveyed by the previous instruction: "You're all about probable cause."  <u>See</u> Ex. A at 20.  Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence."  <u>See</u> <u>id.</u>  Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  <u>See</u> Ex. B at 14-15 (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See</u> Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1)     I have to consider evidence that undercuts probable cause.

(2)     The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

(3)     Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

1  probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

2  of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

3  the Fifth Amendment.[9]

4                                          **III.**

5                **MOTION TO SUPPRESS EVIDENCE UNDER THE FOURTH AMENDMENT**

6         The Fourth Amendment of the United States Constitution guarantees the right of people to be secure

7  in their persons, houses, papers and effects against unreasonable searches and seizures. U.S. Const. Amend.

8  IV.  The Fourth Amendment proscribes "unreasonable searches and seizures."  U.S. Const., amend IV.

9  Temporary detention of individuals during the stop of an automobile, even if only for a brief period and for

10 a limited purpose, constitutes a "seizure" within the meaning of the Fourth Amendment, and must be

11 supported by at least reasonable suspicion.  See Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States

12 v. Martinez-Fuerte, 428 U.S. 543, 556 (1976).  Reasonable suspicion requires that the officer making the stop

13 be "aware of specific, articulable facts which, when considered with objective and reasonable inferences, form

14 a basis for *particularized* suspicion."   United States v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir.

15 2000) (en banc) (emphasis added).

16         The Fourth Amendment protection from unreasonable searches and seizures applies to persons in

17 _____

18         [9] Judge Moskowitz has recently ruled on a motion similar to that filed by
   Ms. Bahnmiller.  See United States v. Martinez-Covarrubias, Case No. 07CR0491-BTM, Order

19 Denying Defendant's Motion to Dismiss the Indictment, dated October 11, 2007 (attached hereto
   as Exhibit J). While Ms. Soto disagrees with Judge Moskowitz's analysis, Judge Moskowitz at

20 least recognizes that a portion of the instruction is error, although he incorrectly found that it was
   not structural. Ex. J at 11. Because, under Judge Moskowitz's analysis, this Court must

21 determine whether the error was harmless, Ms. Soto asks that this Court order the government to
   produce the transcripts of the grand jury proceedings that resulted in the instant indictment.  The

22 Court may order disclosure of grand jury proceedings "at the request of a defendant who shows
   that a ground may exist to dismiss the indictment because of a matter that occurred before the

23 grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  The Ninth Circuit requires a "particularized need"

24 to justify disclosure, see United States v. Walczak, 785 F.2d 852, 857 (9th Cir. 1986), but that
   need cannot be any different than the standard set for in Rule 6(e)(3)(E)(ii): Ms. Soto need only

25 show that "a ground *may* exist to dismiss the indictment because of a matter that occurred before
   the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added).  That is why the Rule's

26 "general suggestion [is] in favor of disclosure."  See Walczak, 785 F.2d at 857.  Here, under

27 Judge Moskowitz's approach to Judge Burns' erroneous instruction, it is clear that, at the very

28 least, "a ground may exist to dismiss the indictment because of a matter that occurred before the
   grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).

1 moving vehicles.  See United States v. Cortez, 449 U.S. 411, 417 (1981).  These protections also apply to

2 persons driving near the United States' border with Mexico.  Roving border patrol agents must have

3 reasonable suspicion, based on specific and articulable facts, in order to initiate a stop.  United States v.

4 Brignoni-Ponce, 422 U.S. 873, 884 (1975); Gonzalez-Rivera v. I.N.S., 22 F.3d 1441, 1445 (1994).

5 "Reasonable suspicion requires that the specific facts and inferences create suspicion 'that the particular

6 person detained is engaged in criminal activity.'"  United States v. Rodriguez-Sanchez, 23 F.3d 1488, 1493

7 (9th Cir. 1994).  Simply put, an officer must have a *particularized and objective basis of criminal activity* in

8 order to detain a motorist.  Cortez, 449 U.S. at 417-418. "Founded suspicion must exist at the time the officer

9 initiates the stop." United States v. Salinas, 940 F.2d 392, 394 (9th Cir. 1991) (citations omitted).

10       Because the Border Patrol agent or agents who initiated and performed the stop in this case did not

11 have the requisite suspicion that the Constitution demands, the stop of Ms. Soto violated her Fourth

12 Amendment rights.

13       On October 29, 2007, government agents seized Ms. Soto in violation of the Fourth Amendment.

14 Agents lacked reasonable suspicion and probable cause to seize Ms. Soto.  For these reasons, Ms. Soto moves

15 to suppress all evidence, including but not limited to her statements, any observations made by the agents, and

16 anything discovered as a result of her unlawful seizure.  In the alternative, Ms. Soto requests an evidentiary

17 hearing on this Fourth Amendment motion.

18     **2.**        **The government bears the burden of justifying this warrantless seizure**

19       Agents seized Ms. Soto without a warrant.  That seizure is therefore presumptively unreasonable.

20 See United States v. Hawkins, 249 F.3d 867, 872 (9th Cir. 2001).  It is the government's burden to

21 demonstrate that its agents complied with the Fourth Amendment.  See id.

22     **3.**        **Agents lacked reasonable suspicion to Stop and Detain Ms. Soto on July 9, 2007.**

23       Although, as discussed below, Ms. Soto's position is that agents needed (at a minium) probable cause

24 to seize her in the manner they chose to do so, agents nonetheless lacked even reasonable suspicion to seize

25 Ms. Soto.  Because they lacked reasonable suspicion to seize Ms. Soto, agents violated the Fourth Amendment

26 when seizing her.

27 //

28 //

1     **4.     Ms. Soto's Fourth Amendment Rights Were Violated When Border Patrol
        Agents Spike-Stripped the Pick-Up Without Probable Cause.**

2

3          Even assuming for the sake of argument that agents had reasonable suspicion to seize Ms. Soto, the

4     manner in which agents chose to seize Ms. Soto warranted at least a level of suspicion of at least probable

5     cause.  As agents lacked probable cause to arrest Ms. Soto.

6          As the Ninth Circuit has observed, "[t]he line between an arrest without probable cause and an

7     investigatory stop based on founded suspicion is blurred and often difficult to determine[.]"  United States

8     v. Beck, 598 F.2d 497, 500 (9th Cir. 1979).  Although "a suspicious individual may be briefly stopped and

9     detained for purposes of limited inquiry . . . . the dimensions of an encounter between the individual and

10    officer may be sufficiently constrictive to cause the average person, innocent of crime, to reasonably think he

11    was being arrested."  Id. (footnote omitted).  In determining whether an arrest has occurred, "a significant

12    consideration is the extent that freedom of movement is curtailed."  Id. at 500-01 (citing Sibron v. New York,

13    392 U.S. 40, 67 (1968)).  "The other critical consideration is the degree and manner of force used in the stop

14    and detention."  Id. at 501.

15                                              **IV.**

16    **THIS COURT SHOULD DISMISS THE INDICTMENT BECAUSE THE GOVERNMENT
       DEPORTED EXCULPATORY WITNESSES**

17

18          The indictment should be dismissed because the government violated Ms. Soto's right

19    to due process under the Fifth Amendment and to compulsory due process under the Sixth Amendment when

20    it removed to Mexico six other individuals encountered with Ms. Soto.  See United States v. Valenzuela-

21    Bernal, 458 U.S. 858 (1982); see also United States v. Mendez-Rodriguez, 450 F.2d 1 (9th Cir. 1971)

22    (government may not deport witnesses who might help the defense); United States v. Gamez-Orduno, 235

23    F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial

24    or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been

25    disclosed, the result of the proceeding would have been different.)

26    **A.     The Indictment must Be Dismissed Because the Government Failed to Make a Good Faith
       Determination as to Whether Any of the Six Alien Witnesses Apprehended with Ms. Soto
27     Possessed Material and Favorable Information to the Defense.**

28          In Valenzuela-Bernal, 458 U.S. at 861, three undocumented aliens were apprehended with the

1   defendant after he led the officers on a high speed chase through an immigration checkpoint. Following their

2   arrest, officers interviewed the defendant and all three undocumented aliens. Id. The three undocumented

3   aliens identified the defendant as the driver. Id. The officers then contacted an Assistant United States

4   Attorney who concluded that the aliens possessed no evidence material to either the prosecution or the

5   defense. Id. Two of the three aliens were deported to Mexico. Id. The defendant was charged with

6   transporting an illegal alien. The defendant made no attempt to explain how the two people who were

7   deported could assist him in proving that he did not know that the third person, who was detained as a witness,

8   was not an illegal alien. Id.

9        The Supreme Court reaffirmed that the deportation of alien witnesses can violate the Fifth

10   Amendment right to due process as well as the Sixth Amendment right to compulsory process, but rejected

11   the Ninth Circuit's "conceivable benefit" test because it found that such a test was a virtual "per se" rule

12   which required little if any showing that the testimony of the absent witnesses would have been either

13   favorable or material. Id. at 866. Thus, the Court held that something more than the mere absence of

14   testimony is necessary to establish a violation of the Fifth and Sixth Amendments. Id. at 872 (discussing Fifth

15   Amendment right); id. at 867 (discussing Sixth Amendment right). Specifically, the defendant must at least

16   make a plausible showing of how the missing witnesses' testimony would have been both material and

17   favorable to his defense. Id. at 867.

18        However, the Court noted that because prompt deportation deprives the defendant of an opportunity

19   to interview the witnesses, "the defendant cannot be expected to render a detailed description of their lost

20   testimony." Id. at 873. The Court further noted that the fact that a defendant has no opportunity to interview

21   the deported witnesses may also support a relaxation of the materiality requirement. See id. at 870. "[T]he

22   events to which a witness might testify, and the relevance of those events to the crime charged, may well

23   demonstrate either the presence or absence of the required materiality." Id. at 871.

24        Important to the holding in Valenzuela-Bernal was the fact that the government interviewed all of

25   the witnesses prior to deporting them. Thus, the Court noted that "the prompt deportation of alien witnesses

26   who are determined by the Government to possess no material evidence relevant to a criminal trial is justified

27   by several practical considerations." Id. at 865. Implicit in this statement is the duty of the government to

28   first make a good faith determination that the alien witnesses possess no evidence favorable to the defense

1    before removing them.

2        In contrast, here, the government failed to interview the alien witnesses regarding what if any

3    information they had regarding the allegations against Ms. Soto and specifically, what information they had

4    about the stop of the vehicle Ms. Soto was driving.

5        The government's lack of good faith, or in other words, bad faith is apparent from the facts.  Unlike

6    the agents in Valenzuela-Bernal, it appears that the agents here failed to interview the witnesses to determine

7    whether they had any information material to the validity of the stop

8        The government must prove that any waiver of her right to retain witnesses is knowing and

9    intelligent.  See United States v. Lujan-Castro, 602 F.2d 877, 878-79 (9th Cir. 1979) (reaffirming the

10   significance of the right to retain deportable alien witnesses as established in Mendez-Rodriguez, but holding

11   that such right could be waived, so long as any such waiver was made knowingly and intelligently).

12       Where, as here, the government apparently failed to interview the witnesses before removing them

13   to Mexico in order to make any good faith determination whether the witnesses possessed evidence favorable

14   to the defense, the requirement under Valenzuela-Bernal that the defendant present a plausible theory as to

15   how the testimony of the deported witnesses would be both material and favorable to the defense should not

16   apply.  See Valenzuela-Bernal, 458 U.S. at 867 (explaining that defendant must make a plausible showing

17   of how the deported witnesses' testimony would have been material and favorable to the defense).

18   **B.    The Court Should Hold an Evidentiary Hearing to Determine Whether the Deported
       Witnesses Were Interviewed and What Information Was Obtained from them Prior to Their**
19     **Removal.**

20       The government has the obligation to provide a defendant with all exculpatory evidence within its

21   control.  See Brady v. Maryland, 373 U.S. 83, 87 (1963); see also Gamez-Orduno, 235 F.3d at 461.  The

22   government should not be able to avoid its obligation under Brady by destroying exculpatory evidence before

23   the defendant has the opportunity to preserve it for trial.  For that reason, a showing of bad faith is not required

24   where the government removes people it knows can provide exculpatory evidence.  Cf. United States v. Dring,

25   930 F.2d 687 (9th Cir. 1991) (no one knew what witnesses would have said); Mendez-Rodriguez, 450 F.2d

26   1 (same); Valenzuela-Bernal, 458 U.S. 858 (same).

27       As Judge Kozinski explained in his dissent in United States v. Ramirez-Lopez, 315 F.3d 1143, 1165

28   (9th Cir. 2003) (withdrawn), the bad faith requirement only applies "to innocent removal of aliens by the

1  government." Id.  "Cases where the government removes aliens it knows can provide exculpatory evidence

2  are analyzed pursuant to the standard developed in Brady, and in such cases-let's all say it together-'the

3  question of bad faith [is] irrelevant."  Id.; see also Dring, 930 F.2d at 693, n. 7 (explaining that the bad faith

4  requirement does not apply where the government fails to disclose evidence which it knew to be exculpatory).

5  Thus, if the defendant's assumption that the agents did not interview the witnesses is wrong, and the witnesses

6  did in fact advise the agents that the vehicle did not fail to yield or that they saw no lights or heard no sirens,

7  dismissal would be appropriate even absent a showing of bad faith.  Therefore, this Court should hold an

8  evidentiary hearing to determine whether any of the agents knew that the deported aliens could testify in Ms.

9  Soto's favor.  If any of the agents knew that the witnesses had such information, the indictment must be

10  dismissed regardless of whether the government acted in "bad faith."

11  **D.     Conclusion**

12        The Court should dismiss the indictment under the Fifth Amendment due process clause and the

13  Sixth Amendment compulsory process clause because: 1) the government failed to make a good faith

14  determination as to whether the alien witnesses possessed material evidence favorable to the defense, 2) the

15  government voluntarily returned to Mexico three people without questioning them regarding the

16  circumstances of the stop and without obtaining contact information for them sufficient to enable defense

17  counsel to locate them in Mexico, and 3) Ms. Soto has made a plausible showing that the witnesses possessed

18  material evidence favorable to the defense.  Alternatively, if the Court declines to the dismiss the indictment

19  outright, Ms. Soto respectfully requests an evidentiary hearing on the matter.

20  **V.**

21  **THIS COURT SHOULD SUPPRESS THE STATEMENTS OF ALL UNAVAILABLE WITNESSES**

22        Pursuant to Crawford v. Washington, 541 U.S. 36 (2004), this Court should suppress the statements

23  of all unavailable witnesses

24  **VI.**

25  **THE COURT SHOULD SEVER THE DEFENDANTS' TRIALS**

26        Pursuant to Rule 14(a), if the joinder of defendants appears to prejudice a defendant, the court may

27  sever the defendants' trials. Fed. R. Crim. P. 14(a).  As the 1966 Advisory Committee Note indicates:

28        A defendant may be prejudiced by the admission in evidence against a co-

1  defendant of a statement or confession made by that co-defendant.  This
   prejudice cannot be dispelled by cross-examination if the co-defendant does not
2  take the stand.  Limiting instructions to the jury may not in fact erase the
   prejudice . . .

3

4  A few years after the 1966 Amendment to Rule 14, the Supreme Court decided <u>Bruton v. United States</u>, 391

5  U.S. 123 (1968).  The Court clearly held that admission of a co-defendant's statement at trial implicating the

6  defendant violated the defendant's Sixth Amendment right to confront and cross-examine witnesses.  <u>Id.</u> at

7  126.  Quoting the dissent in <u>Delli Paoli v. United States</u>, 352 U.S. 232, 247-248 (1957), the Court emphasized:

8  The fact of the matter is that too often such admonition against misuse is
   intrinsically ineffective in that the effect of such a nonadmissible declaration
9  cannot be wiped from the brains of the jurors. The admonition therefore
   becomes a futile collocation of words and fails of its purpose as a legal
10 protection to defendants against whom such a declaration should not tell. . . The
   Government should not have the windfall of having the jury be influenced by
11 evidence against a defendant which, as a matter of law, they should not consider
   but which they cannot put out of their minds.

12 <u>Id.</u> at 129 (quotations omitted).  Therefore, the Supreme Court reversed, even though the trial court gave a

13 clear instruction that the confession could not be used against the defendant.  <u>Id.</u> at 137.

14      Here, it is anticipated that the government will attempt to introduce defendants statements from the

15 at trial.  The codefendants' statements implicate Ms. Soto and thus, unless they testify, their statements would

16 violate her Sixth Amendment right to confront and cross-examine the witnesses against her.  As the Supreme

17 Court made clear in <u>Bruton</u>, as well as the 1966 Committee Note to Rule 14, a limiting instruction cannot

18 effectively eliminate the prejudice to Ms. Soto.  Therefore, this Court should sever the defendants' trials to

19 protect Ms. Soto's constitutional rights.

20                                   **VII.**

21                    **<u>MOTION FOR LEAVE TO FILE FURTHER MOTIONS</u>**

22      Ms. Soto believes that discovery is not yet complete and respectfully requests the opportunity to

23 file further motions and/or supplement the motions already filed after reviewing additional discovery and

24 conducting independent investigation.

25 //

26 //

27 //

28 //

# VIII.

## <u>CONCLUSION</u>

For the foregoing reasons, Ms. Soto respectfully requests that the Court grant the above motions.

Respectfully submitted,

Dated: November 26, 2007

 /s/ Jodi Thorp
**JODI THORP**
Federal Defenders of San Diego, Inc.
Attorneys for Ms. Soto